# Illinois Official Reports

## Appellate Court

---

### *Davis v. Burlington Northern Santa Fe Ry. Co.*, 2016 IL App (3d) 150464

---

| | |
|---|---|
| Appellate Court Caption | STEPHEN DAVIS, Plaintiff-Appellant, v. BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-15-0464 |
| Filed<br>Rehearing denied | July 11, 2016<br>August 9, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 11-L-21; the Hon. Scott Shipplett, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | George T. Brugess (argued), of Palos Heights, for appellant.<br><br>Brad A. Elward (argued), Stephen J. Heine, and Andrew T. Bell, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellee. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Lytton and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, Stephen Davis, a locomotive conductor, brought suit under the federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (2012)) against his employer, defendant, Burlington Northern Santa Fe Railway Company, to recover damages for an injury he allegedly suffered at work when he attempted to step up onto the bottom step of a locomotive and pull himself up and his knee gave out. Both sides filed motions for summary judgment. After a hearing, the trial court granted defendant's motion for summary judgment and denied plaintiff's. Plaintiff appeals. We reverse the trial court's judgment and remand for further proceedings.

¶ 2                                                              FACTS

¶ 3 Plaintiff worked for defendant for nearly 40 years and was a locomotive conductor. On November 19, 2009, plaintiff and his crew were sent to retrieve a locomotive, unit number 6203, which had been disconnected from the rear of a coal train and left by itself on one of the main tracks because it was unable to establish radio communication with the front locomotive as required. The radio communication was necessary to allow the front locomotive to control the power, brakes, and other aspects of unit 6203 when it was serving as the rear locomotive of a train. Because unit 6203 was blocking traffic, plaintiff and his crew were sent to move it back to the depot. As plaintiff attempted to step up from the ground to the bottom step of unit 6203 and pull himself up onto the locomotive, which was stationary at the time, he felt a snap in his right knee. Plaintiff's right knee gave out and was injured. Plaintiff immediately reported the injury to the locomotive engineer and to the trainmaster and filled out an injury report. Due to the injury, plaintiff subsequently had to have surgery to repair his right knee and missed several months of work.

¶ 4 In April 2011, plaintiff brought the instant suit under the FELA against defendant to recover damages for his injury. In count I of the second amended complaint, plaintiff alleged, among other things, that (1) the injury to his right knee was the result of a specific accident that occurred on November 19, 2009; (2) on that date, he was ordered to operate a locomotive that was not part of his train consist, locomotive unit number 6203, that was left on the tracks because the locomotive was defective; (3) when he attempted to step up onto the bottom step of unit 6203 and to lift himself onto the locomotive, the ballast (the rocks between, beneath, and to the side of the railroad tracks) under his foot shifted, causing him to twist and to severely injure his right knee; (4) defendant had a nondelegable duty to provide plaintiff with a reasonably safe place to work; (5) defendant violated that duty by committing certain acts of negligence, which were specifically listed in the complaint; (6) one of the acts of negligence that defendant committed was that defendant violated the Locomotive Inspection Act (LIA) (49 U.S.C. § 20701 *et seq.* (2012)) by providing a locomotive (unit 6203) that was not safe to operate and had defects; and (7) defendant's failure to provide plaintiff with a safe place to work by one or more of the specifically listed acts of negligence caused, in whole or in part, plaintiff's injury.[1]

_____

[1]The second amended complaint also contained a second count, which alleged that the injury to plaintiff's right knee was the result of cumulative trauma. The trial court granted summary judgment

¶ 5        The parties filed cross-motions for summary judgment. Attached to the motions were numerous supporting documents, including the depositions of plaintiff, Roland Paulsgrove (the road foreman of engines at the time of the accident), and Dr. Myron Stachniw (plaintiff's orthopedic surgeon); a transcript of the statement that plaintiff gave about the accident to a claims representative in December 2010; the injury report that plaintiff filled out on the day of the accident; and photographs of the steps and handrails of unit 6203 and of the tracks and ballast in the area where the accident occurred. The evidence contained in those supporting documents can be summarized as follows.

¶ 6        In addition to providing much of the background information set forth above, plaintiff testified in his deposition that in the area where unit 6203 was left on the tracks, the ballast was road ballast and was much larger than the typical yard ballast, which was small and level and was meant for walking on. There were dips in that area in the ballast or the ground, and the step up to the bottom step of unit 6203 in that area was quite a bit higher than a normal step because of the dip or valley between the tracks for water runoff. According to plaintiff, the bottom step was about three feet from the ground. Plaintiff confirmed during his deposition testimony that there was nothing defective about the steps of unit 6203 and that there was no foreign substance on the steps at the time of the accident. Rather, plaintiff stated that when he attempted to step up onto the bottom step of unit 6203 and use the handrails to pull himself up onto the locomotive, the ballast gave or slid under his foot or his foot slipped on the ballast and his right knee snapped.

¶ 7        For the most part, the injury report that plaintiff filled out on the date of the accident and the statement that plaintiff gave to the claims representative were consistent with plaintiff's deposition testimony. Although plaintiff made no mention in the injury report that the ballast under his foot had given or slid at the time of the accident, he did mention it in his later statement to the claims representative.

¶ 8        Roland Paulsgrove testified in his deposition that on the date of the accident, he was working for defendant as the road foreman of engines. Prior to plaintiff's injury, the train dispatcher contacted Paulsgrove because the crew of the coal train could not establish radio communication between unit 6203 (the rear locomotive) and the front locomotive. Paulsgrove went to the location where the coal train was stopped and checked the two locomotives and made sure they were set up correctly. Everything looked correct, but the two locomotives would still not communicate. Paulsgrove unhooked unit 6203 from the rear of the coal train and confirmed that it would work on its own as a standalone unit. He then tried reconnecting unit 6203 to the rear of the coal train but again it would not communicate with the front locomotive. According to Paulsgrove, the communication issue could have been caused by any number of reasons, including the curvature of the track in that area or a problem with the communication systems on either of the two locomotive units. Paulsgrove disconnected unit 6203 from the coal train again and told the crew of that train that they could continue on to their destination without a rear unit. Paulsgrove switched the rear unit back to single unit operation and left it sitting there on the main line.

¶ 9        Paulsgrove told the trainmaster that he was looking for another crew to move unit 6203 to the yard and instructed the trainmaster to tell the dispatcher that unit 6203 was ready to go as a

_____

for defendant on that count of the second amended complaint, and plaintiff has not challenged that ruling in this appeal.

lead unit, if they needed a locomotive somewhere else. When plaintiff's crew came on duty, they were sent to retrieve unit 6203 and move it to the Burlington yard so that Paulsgrove could run some more tests on it. According to Paulsgrove, the area where unit 6203 was left on the tracks was a normal crew change location where crew changes took place on a daily basis. As Paulsgrove was working on unit 6203 that evening before plaintiff was injured, Paulsgrove went up and down all four sets of stairs numerous times and had no problem going up the stairs in that location. There was no defect in the stairs or handrails of unit 6203, and the distance from the ground to the bottom step of unit 6203 in that area, according to Paulsgrove, was only about 12 to 14 inches. The ballast in that area was fairly level and did not have any holes or bare spots in it. Later that night at the yard, Paulsgrove was able to get unit 6203 to link up to, and communicate with, another unit, and he released unit 6203 to be used in either a front or rear locomotive position. In Paulsgrove's opinion, there were no defects in unit 6203 and it was safe to use; otherwise, Paulsgrove would not have released it.

¶ 10 Paulsgrove stated in his affidavit that locomotive unit 6203 was in proper condition and was safe to operate without unnecessary danger of personal injury. At the time of plaintiff's injury, there was nothing mechanically defective with unit 6203. The steps and handrails were in proper working order and had no defects of any kind. The ballast in the area where the locomotive was stopped at the time of the injury was appropriate, consistent, and in good condition. There was nothing unusual about that location. It was a daily place of crew changes. Paulsgrove inspected locomotive 6203 both before and after the accident complained of by plaintiff and found it always to be in proper working order mechanically. The locomotive was approved for pickup with an outbound train that same evening in good working order. The failure of locomotive 6203 to connect with other units electronically did not affect the condition of the safe operation of the locomotive.

¶ 11 Dr. Myron Stachniw testified in his deposition that he was plaintiff's treating orthopedic surgeon.[2] On March 11, 2010, Stachniw performed arthroscopic surgery on plaintiff's right knee. Stachniw's postoperative diagnosis was that plaintiff had degenerated and torn menisci, loose bodies in the knee, and osteoarthritis. The condition of plaintiff's right knee was something that had happened over a long period of time. Postoperatively, Stachniw prescribed physical therapy to rehabilitate plaintiff's right knee. When Stachniw saw plaintiff again on April 30, 2010, plaintiff was doing well and had full range of motion in his right knee. At that time, Stachniw cleared plaintiff to return to work with no restrictions. According to Stachniw, as a person became older, the meniscus became dehydrated and brittle and almost any type of motion could cause the meniscus to tear. Stachniw believed that the accident that plaintiff described could have aggravated or accelerated plaintiff's condition. That was a fairly common mechanism by which a person could tear a degenerated meniscus.

¶ 12 A hearing was held on the cross-motions for summary judgment in February 2014. By the time of the hearing, the issues before the court had been fully and thoroughly briefed by the parties. After listening to the oral arguments of the attorneys, the trial court took the case under advisement. The trial court later issued a written ruling. In the ruling, the trial court found that unit 6203 was not "in use" at the time of the injury as was required for the LIA to apply and that

---

[2]Only a small portion of Dr. Stachniw's deposition was attached to defendant's amended motion for summary judgment on count I of the second amended complaint.

plaintiff had failed to establish causation.[3] The trial court, therefore, granted summary judgment for defendant. Plaintiff appealed.

¶ 13                                                    ANALYSIS

¶ 14      Plaintiff argues on appeal that the trial court erred in granting summary judgment for defendant on count I of plaintiff's second amended complaint. Plaintiff asserts that the trial court's ruling was based upon two incorrect findings: (1) that the locomotive was not "in use" at the time of the injury and (2) that causation was lacking. Because of the alleged error, plaintiff asks that we reverse the trial court's ruling and that we remand this case for further proceedings. Defendant argues that the trial court's grant of summary judgment was proper and should be affirmed.

¶ 15      In general, an action brought in state court under the FELA is governed by state procedural law and federal substantive law. *Balough v. Northeast Illinois Regional Commuter R.R. Corp.*, 409 Ill. App. 3d 750, 757 (2011). Under Illinois procedural law, summary judgment should be granted only where the pleadings and supporting documents, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. See 735 ILCS 5/2-1005(c) (West 2012); *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). The purpose of summary judgment is not to try a question of fact, but to determine if one exists. *Adams*, 211 Ill. 2d at 42-43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Id.* at 43. Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Id.* In appeals from summary judgment rulings, the standard of review is *de novo*. *Id.*

¶ 16               I. Whether Unit 6203 Was "In Use" at the Time of the Injury

¶ 17      As for the trial court's first allegedly incorrect finding, plaintiff asserts that unit 6203 was "in use" at the time of the injury for purposes of the LIA and that the trial court erred in reaching the opposite conclusion. To support his claim of "in use," plaintiff points to the evidence presented in the summary judgment proceeding that at the time of the accident, unit 6203 (1) was on the main line and not in a repair facility, (2) had not been formally withdrawn from use, and (3) was in possession of members of the operating department, rather than members of the maintenance crew. Defendant disagrees with plaintiff's assertion and, to support its contention that unit 6203 was not "in use" at the time of the injury, points to some of the other evidence that was presented in the summary judgment proceeding, which indicated that at the time of the accident, unit 6203 (1) had been disconnected from the coal train and left on the tracks by itself because of the communication problem, (2) was not being used in service, and (3) was to be returned to the yard for further inspection and then put away. Both parties cite various cases on the issue of "in use," which they claim support their respective positions.

_____

[3]The second finding as to causation was made implicitly in a letter ruling that was issued by the trial court later in response to a motion by plaintiff for clarification of the previous ruling.

¶ 18    The FELA imposes upon a railroad employer a duty, which cannot be delegated, to provide its employees with a reasonably safe place to work. *Ficken v. Alton & Southern Ry. Co.*, 291 Ill. App. 3d 635, 639-40 (1996); *Elston v. Union Pacific R.R. Co.*, 74 P.3d 478, 482 (Colo. App. 2003). It also provides the sole means by which a railroad employee may recover damages from his employer for a work injury resulting from his employer's negligence. See 45 U.S.C. § 51 (2012); *Elston*, 74 P.3d at 482. In a FELA suit, one of the ways that a railroad employee may establish that his employer was negligent is by showing that his employer violated the provisions of the LIA. See *Elston*, 74 P.3d at 483-84. Such a violation constitutes negligence as a matter of law on the part of the employer. *Id.* at 483.

¶ 19    The LIA provides that:

> "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances
>
> > (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
> >
> > (2) have been inspected as required under this chapter [chapter 207] and regulations prescribed by the Secretary of Transportation under this chapter; and
> >
> > (3) can withstand every test prescribed by the Secretary under this chapter." 49 U.S.C. § 20701 (2012).

The LIA establishes a safety standard or rule, the violation of which, as noted above, gives rise to a cause of action under the FELA. *Coffey v. Northeast Illinois Regional Commuter R.R. Corp. (METRA)*, 479 F.3d 472, 477 (7th Cir. 2007). Similar to the FELA, the LIA is to be liberally construed so as to give effect to its main purpose—to protect railroad employees and others by requiring the use of safe equipment. See *Balough*, 409 Ill. App. 3d at 758 (regarding the LIA); *Elston*, 74 P.3d at 482 (regarding the FELA). The above provision of the LIA, however, only applies if the locomotive in question was "in use" on the railroad's line at the time of the injury. See 49 U.S.C. § 20701 (2012); *Lyle v. Atchison, T. & S.F. Ry. Co.*, 177 F.2d 221, 222 (7th Cir. 1949) (addressing question of "in use" under a prior federal locomotive safety statute); *Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 328 (4th Cir. 1998) (addressing question of "in use" under a similar federal railroad safety statute).

¶ 20    The determination of whether a locomotive was "in use" at the time of an accident is a question of law for the court to decide. See *Balough*, 409 Ill. App. 3d at 757; *Carder v. Indiana Harbor Belt R.R.*, 205 F. Supp. 2d 981, 984 (N.D. Ind. 2002). In making that determination, state courts must look to federal substantive law. *Balough*, 409 Ill. App. 3d at 757. The term "in use" is not defined in the LIA. *Id.* Rather, as established by the case law in this area, courts are to apply a totality-of-the-circumstances, multifactor analysis in determining whether a particular locomotive was "in use" at the time of an injury. See *id.* at 764-65. Some of the factors to be considered in that analysis include: (1) where the locomotive was located at the time of the accident; (2) the activity of the injured party; (3) whether the locomotive was on a track in the rail yard prepared for departure or in the roundhouse for repair; (4) whether the locomotive was being moved to a repair location or to a track for departure; and (5) whether servicing and maintenance work had already been performed. *Id.* at 764. No single factor is dispositive in the analysis. See *id.* at 765.

¶ 21    In the present case, after considering all of the above-referenced factors, we conclude under *de novo* review that the factors weigh strongly in favor of a finding of "in use." When the

accident occurred, unit 6203 was located on the main line and not in a repair facility. It was to be transported back to the yard to be put immediately back into service as a front locomotive, if needed, and, if not, so that some additional testing could be done by Paulsgrove. Plaintiff, a locomotive conductor, was a member of the operating team and was not a member of the maintenance staff. He had been sent to that location to move unit 6203 from the main track because it was blocking traffic. Although some testing of unit 6203 had been done, the unit had already been cleared to be used as a front unit and was released a short time later to be used as either a front or rear unit, after some brief additional testing was done by Paulsgrove at the train yard. For all of the reasons stated, we find as a matter of law that unit 6203 was "in use" on the railroad's line at the time of the accident for the purposes of the LIA. Compare *Brady v. Terminal R.R. Ass'n*, 303 U.S. 10, 13, 15-16 (1938) (the United States Supreme Court found that a train car was "in use" under a similar federal railroad safety statute where the plaintiff, an inspector, was injured while performing an inspection on the train car after it had been moved to a temporary location for that purpose so that the carrier could determine whether it was going to accept the train car; the Supreme Court noted that the case was not one where a defective car had reached a place of repair and pointed out that the carrier would still be liable under the act, even if the equipment was known to be defective, if the railroad employee was injured while hauling the defective equipment to the nearest available point for repairs), and *Balough*, 409 Ill. App. 3d at 767-68 (the Illinois Appellate Court found that a locomotive was "in use" under the LIA where the plaintiff, a locomotive engineer, was injured while he was boarding the locomotive in the train yard so that he could move it into position for the evening rush on the carrier's commuter lines after the locomotive had been released by the carrier's mechanical department), with *Lyle*, 177 F.2d at 222-23 (the Seventh Circuit Court of Appeals held that a locomotive was not "in use" under a prior federal locomotive safety statute where the plaintiff, a member of the maintenance or servicing department, was injured while performing servicing work on the locomotive after it had ended its run and was placed at or near the roundhouse for servicing), *Tisneros v. Chicago & N.W. Ry. Co.*, 197 F.2d 466, 467-68 (7th Cir. 1952) (same), and *Carder*, 205 F. Supp. 2d at 982 (the District Court held that a locomotive was not "in use" under the LIA where the plaintiff, an electrician employed at the carrier's repair facility, was injured while repairing the defective locomotive, which had been placed on a regular track in the train yard in a spot where it would not impede operations and was "blue-flagged" to indicate that it was being worked on and was not ready for use).

¶ 22                                    II. Whether Causation Was Lacking

¶ 23        As for the trial court's second allegedly incorrect finding, plaintiff asserts that he presented sufficient evidence of causation to survive summary judgment and that the trial court erred by concluding to the contrary. According to plaintiff, it was for the jury to determine whether the LIA violation and the condition of the ballast in the area had contributed to plaintiff's injury. Defendant again disagrees.

¶ 24        The purpose of the FELA is to provide a remedy to railroad employees for injuries sustained from railroad accidents. 45 U.S.C. § 51 (2012); *Hahn v. Union Pacific R.R. Co.*, 352 Ill. App. 3d 922, 929 (2004). The provisions of the FELA must be construed liberally so as to give effect to Congress's intent to promote railroad safety. See *Elston*, 74 P.3d at 482. While the FELA allows an employee to recover damages for an injury that is caused by his employer's negligence, the employee's burden to prove proximate cause in a FELA action is

much less stringent than it would be in an ordinary common-law negligence action. See *CSX Transportation, Inc. v. McBride*, 564 U.S. 685, 691-92 (2011); *Hahn*, 352 Ill. App. 3d at 930. To avoid a summary judgment on the issue of causation, a plaintiff in a FELA action is only required to elicit evidence that the defendant's negligence played any part, however slight, in bringing about the plaintiff's injury. See *McBride*, 564 U.S. at 692; *Hahn*, 352 Ill. App. 3d at 930.

¶ 25    We believe that plaintiff has met that burden here. See *McBride*, 564 U.S. at 692; *Hahn*, 352 Ill. App. 3d at 930. First, plaintiff sufficiently established for the purposes of avoiding summary judgment that unit 6203 was defective and in violation of the LIA because it was unable to make radio contact with the front locomotive of the coal train that evening. See 49 U.S.C. § 20701 (2012); *Balough*, 409 Ill. App. 3d at 756-57. Under the established case law, that violation constituted negligence as a matter of law (see *Elston*, 74 P.3d at 483), and causation was sufficiently shown because plaintiff was injured while attending to that violation. See *Wilson v. Union Pacific R.R. Co.*, 56 F.3d 1226, 1230 (10th Cir. 1995) (finding that the violation of a similar safety statute was the cause of the injuries of the plaintiff, a brakeman, who stepped in a rut and injured his ankle while attending to the violation). Second, the defective locomotive was left in an area where it was arguably unsafe to walk, an area where larger ground ballast was applied, the ground was uneven due to drainage, and plaintiff was required to step up a large distance (estimated at about three feet) to board the train. Under the circumstances involved in the present case, it was the role of the jury—and not the trial court—to determine whether defendant's alleged violation and the area where defendant left unit 6203 played any part, no matter how slight, in producing plaintiff's injury. See *McBride*, 564 U.S. at 692; *Hahn*, 352 Ill. App. 3d at 930.

¶ 26                    III. Other Possible Grounds for Grant
                   of Summary Judgment in Defendant's Favor

¶ 27    In response to plaintiff's overall claim that summary judgment should not have been granted for defendant, defendant also asserts that summary judgment in its favor was proper because (1) plaintiff failed to make any showing of a defect, (2) even if plaintiff established that there was a defect, that defect did not violate the LIA because it did not make the locomotive unsafe to operate (there was no nexus between the alleged defect and plaintiff's injury), (3) there was no showing of any negligence on the part of defendant, and (4) defendant is allowed an opportunity to inspect a locomotive and correct any defects before liability attaches under the LIA. Plaintiff disagrees with all of those contentions.

¶ 28    To the extent that defendant's additional contentions are not merely restatements of the claims that defendant has already made, we reject all of those contentions for the reasons that follow. First, in the summary judgment proceeding, although proof of a defect may not have been necessary, plaintiff presented sufficient evidence to establish a genuine issue of material fact as to whether a defect existed in that unit 6203 would not communicate with the front locomotive as required. In reaching that conclusion, we note, however, that when a part or appurtenance of a locomotive does not work properly, no showing of a defect is required. See *Elston*, 74 P.3d at 484. Second, plaintiff presented sufficient evidence in the summary judgment proceeding to establish a genuine issue of material fact as to whether defendant had violated the LIA. See 49 C.F.R. § 229.13 (2011) (requiring that locomotives that are coupled in remote or multiple control be able to respond to control from the lead locomotive); *Elston*, 74

P.3d at 484. Such a violation would constitute negligence as a matter of law. See *Elston*, 74 P.3d at 483. Third and finally, in the summary judgment proceeding, plaintiff presented sufficient evidence to establish a genuine issue of material fact as to whether his injury was caused by defendant's violation of the LIA. See *Wilson*, 56 F.3d at 1230. Although we recognize that the LIA contains a safe harbor provision as defendant suggests, which allows a carrier to remove a defective locomotive from service and repair it without absolute liability attaching under the LIA (see 49 C.F.R. § 229.9 (2011)), there is no indication in this record that defendant made any effort to follow the very specific provisions of the statute that were necessary to invoke the safe harbor provision.

¶ 29                                          CONCLUSION

¶ 30        For the foregoing reasons, we reverse the judgment of the circuit court of Knox County and remand this case to the trial court for further proceedings.

¶ 31        Reversed and remanded.